[Cite as *Wulco, Inc. v. O'Gara Group, Inc.*, 2023-Ohio-4023.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | |
|---|---|
| WULCO, INC., | : |
| Appellee, | : CASE NOS. CA2023-03-033 |
| | CA2023-03-034 |
| - vs - | : |
| | O P I N I O N |
| | : 11/6/2023 |
| THE O'GARA GROUP, INC., AND | : |
| MONROE CAPITAL PARTNERS FUND LP, | |
| | : |
| Appellants. | : |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV 2022 03 0460

Dressman Benzinger LaVelle psc, and Justin L. Knappick and Jon V. Connor, for appellee.

Taft Stettinius & Hollister LLP, and Alex E. Wallin, for appellant, The O'Gara Group, Inc.

Frost Brown Todd LLP, and Kevin R. Carter and Simon Y. Svirnovskiy, for appellant Monroe Capital Partners Fund LP.

**S. POWELL, P.J.**

{¶ 1} Monroe Capital Partners Fund LP, an interested party, and The O'Gara Group, Inc., the defendant, appeal the order of the Butler County Common Pleas Court awarding funds garnished from O'Gara to Wulco, Inc., the plaintiff, a judgment creditor of

O'Gara.  For the reasons discussed in this opinion, we reverse.

## I. Facts and Procedural History

{¶ 2}  O'Gara manufactures tactical vehicles for the U.S. military.  Wulco and its various corporate divisions supply armor components and assemblies for military platforms, specialized tooling, and industrial crates.  During December 2021 and January 2022, O'Gara purchased goods from Wulco and failed to pay for those purchases.

{¶ 3}  O'Gara was in financial trouble, and not only could it not pay Wulco but it could not make payments on tens of millions of dollars in loans.  After O'Gara failed to respond to Wulco's written request for assurance of payment, Wulco filed suit for breach of contract and unjust enrichment.  O'Gara failed to defend, and on June 8, 2022, the trial court entered a default judgment to Wulco, awarding Wulco the principal sum of $565,527.70, storage costs of $2,940 (accumulating at $980 per month), interest, and costs.

{¶ 4}  On June 21, 2022, the court issued an order and notice of garnishment to JPMorgan Chase Bank, where O'Gara maintained bank accounts.  The notice ordered JPMorgan to complete and return the "Answer of Garnishee" "together with the amount determined in accordance with the answer of the garnishee" to the Butler County Clerk of Courts.  The notice stated that the total probable amount due on the judgment was $568,937.74.  Upon receipt of the garnishment order, JPMorgan delivered $568,937.74 from one of O'Gara's accounts to the clerk (received on July 13, 2022) with a notice stating that the funds "may be subject to claims which may reduce the amount available to the judgment creditor, including * * * [:] rights of third parties asserting an interest in the account."

{¶ 5}  On July 21, O'Gara filed a request for a garnishment hearing, disputing Wulco's right to garnish the funds in its JPMorgan account.  O'Gara contended that the

funds were subject to a perfected security lien held by Monroe, making Monroe a secured creditor with a higher-priority lien and giving Monroe a superior interest in the funds. The next day, Monroe filed a motion to intervene to raise its defense to garnishment. The trial court granted the motion in part and denied it in part. The court limited Monroe's intervention to participating in a garnishment hearing and allowing it to provide evidence of its claimed security interest in the funds.

{¶ 6} The evidence presented by Monroe shows that in June 2011 Monroe and O'Gara executed a Credit Agreement and a separate Security Agreement under which Monroe, sometimes in combination with other lenders, began to make a series of secured loans to O'Gara to help restructure its debt and provide working capital. A year later, O'Gara began defaulting on the loans. Monroe, and the other lenders, agreed to waive these defaults, and the parties entered into a series of amendments to the Credit Agreement. Finally, O'Gara's senior secured lender triggered liquidation proceedings, hiring a restructuring officer to wind down the business. In May 2022, O'Gara closed its doors. By then, O'Gara owed Monroe more than $47 million.

{¶ 7} The Security Agreement granted Monroe a continuing security interest in (among other things) all O'Gara's "Deposit Accounts," which included those it maintained with JPMorgan. In October 2020, Monroe became a party to an "Amended and Restated Blocked Account Control Agreement" along with UMB Bank (O'Gara's senior lender at the time), O'Gara, and JPMorgan. The expressed purpose of the Control Agreement was to give UMB Bank and Monroe "control over the Account within the meaning of Section 9-104 of the Uniform Commercial Code." Since then, UMB Bank has been paid off in full, making Monroe the senior lender.

{¶ 8} At a discovery conference in the garnishment action, the parties and the court

agreed that the parties would brief the issue of lien priority. A garnishment hearing was held on January 23, 2023. Monroe argued that it had proved that it has an earlier-in-time, perfected security interest in O'Gara's deposit account, established by the Security Agreement, Credit Agreement, and Control Agreement. Wulco argued that Monroe did not prove its security interest and that neither O'Gara nor Monroe raised a valid defense to the garnishment. Wulco also argued that, even if Monroe had a perfected security interest, it was stripped when the funds were delivered to the clerk under R.C. 1309.332(B), Ohio's codification of Section 9-332 of the Uniform Commercial Code ("UCC"), which provides: "A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party." The parties agreed at the hearing that the trial court would decide two questions: whether Monroe had met its burden to prove that it has a perfected security interest, and whether R.C. 1309.332(B) applied to strip the security interest.

{¶ 9} On February 27, 2023, the trial court overruled Monroe's objection to the garnishment and awarded the garnished funds to Wulco. The court agreed with Wulco that Monroe had failed to present a valid defense to the garnishment, instead making a lien-priority attack on the judgment. The court also agreed that the clerk was a "transferee of funds from a deposit account" and that R.C. 1309.332(B) had stripped the funds of any security interest that Monroe had.

{¶ 10} Monroe and O'Gara appealed.

**II. Analysis**

{¶ 11} The sole assignment of error alleges:

{¶ 12} "The trial court erred by rejecting the defenses of appellants Monroe Capital Partners Fund LP and The O'Gara Group, Inc. to appellee Wulco, Inc.'s garnishment of

- 4 -

O'Gara's deposit-account funds and by ruling that the garnished funds should be paid to Wulco instead of Monroe."

{¶ 13} Monroe argues that the trial court erred in determining that it failed to present a valid defense to garnishment and in determining that the clerk of courts was a "transferee" under R.C. 1309.332(B) such that Monroe's security interest in the funds has been stripped and the funds could be used to satisfy O'Gara's debt to Wulco. Monroe asserts that these are errors of law. We review alleged errors of law de novo. *See Ohio Bell Tel. Co. v. Pub. Util. Comm.*, 64 Ohio St.3d 145, 147 (1992).

## A. Wulco's garnishment

{¶ 14} When Wulco's order of garnishment of property and notice was served on garnishee JPMorgan, the order bound the property of judgment-debtor O'Gara that was in JPMorgan's possession. *See* R.C. 2716.13(B). That property was attached, and a lien was imposed in favor of judgment-creditor Wulco. *See Marinik v. Cascade Group*, 103 Ohio Misc.2d 18, 23 (M.C.1999) ("Attachment occurs when the order of garnishment of property * * * is served upon the garnishee in possession of the property of the judgment-debtor"). The property that Wulco sought to garnish was not the funds themselves that O'Gara had deposited in the bank but O'Gara's contractual right to receive them. *See Goralsky v. Taylor*, 59 Ohio St.3d 197, 198 (1991) (stating that "where the depositor is a judgment debtor and the bank is a garnishee, the property being garnished is, strictly speaking, not the funds themselves, but the debtor's contractual right to receive them"). In other words, Wulco's judgment lien attached to an "obligation," JPMorgan's obligation to pay O'Gara's demand for its deposited funds. The garnishment order and notice instructed JPMorgan to pay the probable amount due Wulco to the Butler County Clerk of Courts. *See* R.C. 2716.13(B); R.C. 2716.21. Which JPMorgan did.

**{¶ 15}** Notice of the garnishment was sent to O'Gara stating that it had the right to object to the garnishment and to dispute Wulco's right to garnish its property on the basis that Wulco should not be given O'Gara's property held by JPMorgan because the property is "exempt" or the "order is improper for any other reason." R.C. 2716.13(C)(1)(a). Accordingly, O'Gara was given the opportunity to "attempt to defeat the garnishment order by establishing an exemption or other defense to garnishment." *E. Liverpool v. Buckeye Water Dist.*, 7th Dist. Columbiana Nos. 11 CO 41 and 11 CO 42, 2012-Ohio-2821, ¶ 39. O'Gara filed an objection arguing, in essence, that garnishment of the funds was improper because Monroe had a security interest in them. The trial court permitted Monroe to intervene to prove its alleged security interest in the funds.

**{¶ 16}** At the conclusion of the garnishment hearing, the court had to determine what amount of O'Gara's funds in its deposit account with JPMorgan could be used to satisfy the debt. *See* R.C. 2716.13(C)(5). The hearing, then, was for the limited purpose of considering the amount of the funds that could be used to satisfy O'Gara's debt to Wulco. *See Liverpool* at ¶ 39. The trial court determined that all the funds could be used to satisfy the debt. The court found that Monroe had failed to present a valid defense. According to the trial court, Monroe had improperly attacked the default judgment, and regardless, any security interest that Monroe had in the funds was stripped under R.C. 1309.332(B) when the funds were paid to the clerk.

**B. Did Monroe present a valid defense to garnishment?**

**{¶ 17}** The first issue here is whether Monroe presented a valid defense to garnishment. We conclude that it did.

**{¶ 18}** Monroe's defense was that its earlier-in-time, perfected security interest in O'Gara's deposit account defeated Wulco's interest. This defense raises the question which

- 6 -

creditor—the judgment creditor or the secured creditor—has priority to the debtor's funds. A security interest in specific property is "superior" to a judgment lien over that property if the judgment lien attached after the security interest was perfected. *See* R.C. 1309.317(A)(2)(a). Accordingly, if the secured creditor establishes that, under the law, it has priority to the garnished funds, the garnishor judgment creditor's claim to the funds is defeated. Thus, Monroe presented a valid defense to garnishment, because if established, the bank account funds cannot be used to satisfy O'Gara's debt to Wulco.

{¶ 19} Where the trial court went wrong was in its reliance on *Liverpool v. Buckeye Water Dist.* The court, in its order, quoted from *Liverpool*:

> By following the procedures delineated in Chapter 2716 of the Revised Code, a judgment creditor may garnish the property of the judgment debtor, even if that property is in the possession of a third party, such as a bank. R.C. 2716.01(B). When a bank receives a garnishment notice, it looks to the name on the account to determine whether garnishment of that account is proper. "If the judgment debtor has a contractual right to demand payment of the funds, then those funds held for the benefit of the judgment debtor may be subject to garnishment." *Leman v. Fryman*, Hamilton App. No. C-010056, at ¶15. Thus in garnishment proceedings, the court is not concerned with who actually owns the property subject to garnishment as it is with who possesses it.

*Liverpool*, 2012-Ohio-2821 at ¶ 43, quoting *Dovi Interests, Ltd. v. Somerset Point Ltd. Partnership*, 8th Dist. No. 82788, 2004-Ohio-636, ¶ 12. The trial court emphasized the last sentence in the above quotation and said that "its [Monroe's] lien-priority argument cannot defeat the possessory clause of the statute." The problem is that *Liverpool* was talking about commingled funds in a bank account. The appellate court was supporting its conclusion that "[c]ommingled funds which belong to a third party, but which are deposited in an account which names the judgment debtor, may be garnished." *Id.* Monroe's defense had nothing to do with commingled funds in O'Gara's bank account.

- 7 -

**C. Did Monroe have a security interest in the funds?**

{¶ 20} The next question is whether Monroe established that it has a security interest in the funds, which would make garnishment improper. We consider whether Monroe had a prior security interest in the funds and, if so, whether the security interest was stripped when the funds were paid to the clerk.

**1. Security interests in deposit accounts**

{¶ 21} Security interests are generally governed by R.C. Chapter 1309, Ohio's version of Article 9 of the Uniform Commercial Code ("UCC"). When interpreting Ohio statutes based on the UCC, the Ohio Supreme Court has relied on the UCC's Official Comments as well as case law in other jurisdictions, because "'it is desirable to conform our interpretations of the Uniform Commercial Code to those of our sister states.' Relying on the Official Comments to the UCC helps to achieve this uniformity, as does reviewing case law that has previously interpreted particular provisions." *Casserlie v. Shell Oil Co.*, 121 Ohio St.3d 55, 2009-Ohio-3, ¶ 18, quoting *Edward A. Kemmler Mem. Found. v. 691/733 E. Dublin-Granville Rd. Co.*, 62 Ohio St.3d 494, 499 (1992).

{¶ 22} A "security interest" is "an interest in" property that "secures payment or performance of an obligation." R.C. 1301.201(B)(35) (defining "security interest"). "Collateral" is "the property that is subject to a security interest." R.C. 1309.102(A)(12) (defining "collateral"). It can include "proceeds," R.C. 1309.102(A)(12)(a), which, pertinent here, can be "[r]ights arising out of collateral." R.C. 1309.102(A)(64) (defining "proceeds"). "Cash proceeds" are "proceeds that are money, checks, deposit accounts, or the like." R.C. 1309.102(A)(9) (defining "cash proceeds"). And a "deposit account" is pertinently defined as a "demand, * * * savings, * * * or similar account maintained with a bank." R.C. 1309.102(A)(29).

**{¶ 23}** A security interest is created by a "security agreement" in favor of a "secured party." R.C. 1309.102(A)(74) (defining "security agreement"); R.C. 1309.102(A)(73)(a) (pertinently defining "secured party"). A "debtor" is "[a] person having an interest, other than a security interest or other lien, in the collateral." R.C. 1309.102(A)(28)(a) (defining "debtor"). A security agreement is generally effective between the parties, against purchasers of the collateral, and against creditors. R.C. 1309.201(A).

**{¶ 24}** Attachment and perfection are two key events connected to a security interest. When a security interest "attaches" to collateral, it becomes enforceable against the debtor. R.C. 1309.203(A). To obtain protection against the claims of third parties who acquire interests in the collateral, a secured party must "perfect" the security interest. *See* R.C. 1309.317.

**2. Monroe has an attached security interest in O'Gara's JPMorgan deposit accounts**

**{¶ 25}** A security interest attaches to a collateralized deposit account only if: (1) value has been given; (2) the debtor has rights in the deposit account or the power to transfer rights in the account to a secured party; and (3) the debtor has signed a security agreement that identifies the collateral or the secured party has control of the deposit account under R.C. 1309.104 pursuant to the security agreement. R.C. 1309.203(B)(3)(a) and (d).

**{¶ 26}** Here, the deposit accounts at JPMorgan secured O'Gara's payment or performance of loans that Monroe made to O'Gara. Monroe's security interest attached to the deposit account in 2011 as a result of Monroe's loans to O'Gara under the Credit Agreement and the Security Agreement. There is no question that Monroe gave O'Gara value for a security interest in the accounts. The Credit Agreement plainly shows that Monroe agreed to loan O'Gara money in exchange for the security interest, as the first two "Recitals" state:

> WHEREAS, Borrowers desire that Lenders extend a revolving and term credit facility to Borrowers to fund the repayment of certain indebtedness of Borrower, to provide working capital financing for Borrower, and to provide funds for other general corporate purposes of Borrowers; and

> WHEREAS, Borrowers desire to secure all of its Obligations (as hereinafter defined) under the Loan Documents (as hereinafter defined) by granting to Agent, for the benefit of Agent and Lenders, a security interest in and lien upon substantially all of its assets[.]

There is also no question that O'Gara had rights in the deposit accounts. Lastly, O'Gara signed the Security Agreement that describes the collateral as "all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of" O'Gara, including:

> (viii) all Deposit Accounts, including the Disbursement Account, all lockboxes and lockbox accounts and all other bank accounts and all deposits therein;

> (ix) all money, cash, or cash equivalents; [and]

> * * *

> (xii) to the extent not otherwise included, all Proceeds * * * and other rights to payments not otherwise included in the foregoing * * *.

{¶ 27} We reject Wulco's argument that Monroe failed to prove that it had a security interest because it did not present a promissory note. Wulco states in its brief: "According to Monroe, the value given was a loan. But Monroe never submitted a signed promissory note and, therefore, never proved that its alleged security interest was enforceable." Wulco cites no provision in the UCC stating that a promissory note is required to establish that value was given. As we said above, the Credit Agreement establishes that a loan was the value Monroe gave O'Gara for the security interest.

{¶ 28} Therefore, having satisfied the statutory requirements for attachment, Monroe

had an attached security interest in O'Gara's JPMorgan deposit accounts.

### 3. Monroe perfected its security interest in the deposit accounts

{¶ 29} A security interest in a deposit account is perfected by control. R.C. 1309.310(B)(8). R.C. 1309.104 provides:

> (A) A secured party has control of a deposit account if:
>
> * * *
>
> (2) The debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor; * * *
>
> * * *
>
> (B) A secured party that has satisfied division (A) of this section has control of a deposit account, even if the debtor retains the right to direct the disposition of funds from the deposit account.

When a deposit account is taken as original collateral, obtaining control is the only method of perfection. *See* R.C. 1309.312(B)(1). An Official Comment to UCC 9-104 regarding the requirements for "control" explains:

> [A] secured party may obtain control by obtaining the bank's authenticated agreement that it will comply with the secured party's instructions without further consent by the debtor. * * * An agreement to comply with the secured party's instructions suffices for 'control' of a deposit account under this section even if the bank's agreement is subject to specified conditions, e.g., that the secured party's instructions are accompanied by a certification that the debtor is in default.

*See* R.C. 1309.104, Official Comment 3. The comments note that "[t]his section derives from section 8-106 of revised article 8, which defines 'control' of securities and certain other investment property." *Id.*, Official Comment 2. A comment to UCC 8-106 points out that "[t]he term 'control' is used in a particular defined sense," and goes on to explain what "control" means for securities. R.C. 1308.24, Official Comment 7. Paraphrasing that

comment and applying what it says to deposit accounts, what "control" means is that the secured party can control the deposit account without further action by the debtor. There is no requirement that the powers held by the secured party be exclusive. For example, if the secured party wants, it can allow the debtor to retain the right to direct the disposition of funds from the deposit account. The test of control is not whether the debtor has retained other powers but whether the secured party has obtained the requisite power. Retention by the debtor of powers is not inconsistent with the secured party having control. Nor is there a requirement that the secured party's powers be unconditional, provided that further consent of the debtor is not a condition.

{¶ 30} Monroe has control of O'Gara's JPMorgan deposit accounts. Monroe obtained control on October 26, 2020, under the "Amended and Restated Block Control Agreement," which it signed along with O'Gara, JPMorgan, and UMB Bank, the then-senior lender. Control over the accounts was the stated intent of the Control Agreement. The first sentence of the second paragraph states: "It is the intent of the parties to this Agreement that the Agents [UMB Bank and Monroe] have control over the Account within the meaning of Section 9-104 of the Uniform Commercial Code."

{¶ 31} The Control Agreement defines UMB Bank and Monroe as "Agents." UMB Bank is the "First Lien Agent," and Monroe is the "Second Lien Agent." The "Control Agent" is initially UMB Bank. The Agreement provides that when UMB Bank resigns Monroe becomes the Control Agent. O'Gara continues to have the right to direct the disposition of funds from its bank accounts. But that changes when the Control Agent files a "Shifting Control Notice" with the bank. At that point—and without O'Gara's consent—the Control Agent takes over the accounts and O'Gara loses all rights over the funds in the accounts.

{¶ 32} Based on our "control" discussion above, none of this undercuts the

conclusion that Monroe has "control" over O'Gara's JPMorgan bank accounts. One of Monroe's executives stated in his deposition that Monroe had not yet formally taken control of O'Gara's accounts by filing a Shifting Control Notice. But the fact that it could have done so unilaterally at any time means that it had control over the bank account for purposes of R.C. 1309.104.

{¶ 33} Therefore, Monroe has a perfected security interest in O'Gara's JPMorgan bank accounts. Monroe also has a perfected security interest in the "proceeds" of the accounts, the funds on deposit. *See* R.C. 1309.102(A)(64). And this perfected security interest arose before Wulco obtained its default judgment against O'Gara.

### 4. Monroe's security interest was not stripped when the funds were paid to the Clerk of Courts

{¶ 34} Without any analysis, the trial court concluded that Monroe's security interest was stripped under R.C. 1309.332(B) when JPMorgan paid the funds to the Butler County Clerk of Courts. That section pertinently provides that "[a] transferee of funds from a deposit account takes the funds free of a security interest in the deposit account." The term "transferee" here is not defined. While the trial court evidently had every confidence that the clerk was a "transferee" within the meaning of the statute, we do not share that confidence.

{¶ 35} In support of the trial court's conclusion, Wulco cites several cases, beginning with *Orix Financial Services Inc. v. Kovacs*, 167 Cal.App.4th 242 (Cal.App.2008). In this California garnishment action, an unsecured judgment creditor obtained garnished funds from a judgment debtor's bank account. Subsequently, in a separate action, a third-party secured creditor attempted to claw back the funds from the judgment creditor. The appellate court concluded that the judgment creditor was a "transferee of funds" under UCC 9-332(b) and took the garnished funds free of any security interest. The court held that the

- 13 -

broad language of UCC 9-332(b) did not support the secured creditor's contention that a judgment creditor was not the kind of transferee contemplated by that section. The judgment creditor's status as a creditor was irrelevant, said the court, and there was no requirement that the debtor actively or voluntarily make a payment. UCC 9-332 required only a transfer of funds.

{¶ 36} *Orix* is readily distinguishable on its facts from the present case. In *Orix*, the judgment creditor had already obtained the garnished funds from the debtor, and the secured creditor was trying to claw back the funds from the judgment creditor in a separate action. So the issue did not arise in the context of an inchoate garnishment action, like in the present case. Also, there was no temporary holder of the funds, like the clerk in this case.

{¶ 37} More analogous is *Stierwalt v. Associated Third Party Admrs.*, Case No. 16-mc-80059-EMC, 2016 U.S. Dist. LEXIS 68744 (N.D.Cal.2016), another California case on which Wulco relies. In that case, the district court applied UCC 9-332 to protect a judicial lien creditor who had not yet actually received funds from debtor's deposit account. The plaintiff had obtained judgment against the defendants in a New York court. Then the plaintiff obtained a writ of execution from the California court to levy funds held by the defendant in a bank account. The U.S. Marshal levied on the bank account and obtained the funds from the bank. Before the funds were released to the plaintiff, third parties filed a claim that they had security interest in the funds. The dispute before the *Stierwalt* court was between the plaintiff and the third parties as to whether the funds in the bank account should be distributed to the plaintiff.

{¶ 38} The district court conceded that an argument could be made that a judgment creditor who obtains funds from a deposit account under a writ of execution is not a

"transferee of funds" for purposes of UCC 9-332(b).  But the court relied on *Orix*'s conclusion that a judgment creditor is a transferee of funds for purposes of the statute, a conclusion that the court said clearly supported the plaintiff's position.  While the third parties had a perfected security interest in the account funds, the court determined that their claim ultimately failed because UCC 9-332(b) stripped that security interest.  The court concluded that "there was a transfer pursuant to § 9332(b) when the U.S. Marshal levied upon the bank account, such that [judgment creditor] 'takes the funds free of a security interest in the deposit account.'"  *Stierwalt* at *23.

{¶ 39}  The court recognized that *Orix* involved a different procedural posture but found that there was no material difference.  "The bottom line," said the court, "is that Orix was claiming as a secured party against a transfer of funds from a bank account, just as [the third party] is doing in the case at bar."  *Id.* at *22.  The district court, therefore, held that a judgment creditor was a "transferee" of funds upon obtaining a writ of execution to levy funds, even though, unlike in *Orix*, there had been no actual transfer of funds to the judgment creditor yet.

{¶ 40}  Two bankruptcy courts have applied *Orix* and *Stierwalt* to bankruptcy trustees. In *In re Delano Retail Partners, LLC*, 2017 Bankr. LEXIS 2397 (E.D.Cal.2017), a California bankruptcy court found that the bankruptcy code confers on a trustee the status of a judgment creditor and lienholder as of the date a bankruptcy petition is filed.  Under *Orix* and *Stierwalt*, said the court, that makes the trustee a transferee under UCC 9-332.  Thus the court held that the trustee took trust account funds from a client trust account "free and clear of any existing security interest." *In re Delano* at *24.  And in *In re Charleston Assocs., LLC*, 2017 Bankr. LEXIS 4581 (D.Nev.2017), a Nevada bankruptcy court held that a judgment creditor was a "transferee of funds" under UCC 9-332 when the funds were

remitted to the creditor.

{¶ 41} Monroe relies on a different set of cases to argue that UCC 9-332(b) did not strip its security interest in the funds from O'Gara's deposit account.

{¶ 42} In *Zimmerling v. Affinity Financial Corp.*, 86 Mass.App.Ct. 136 (Mass.App.2014), the Massachusetts appellate court held that UCC 9-332 did not apply to funds wired to an escrow account. "'To deposit a sum in escrow is simply to deliver it to a third party to be held until the performance of a condition or the happening of a certain event.'" *Zimmerling* at 139, quoting *Childs v. Harbor Lounge of Lynn, Inc.*, 357 Mass. 33, 35 (1970). "[T]he escrow arrangement was both conditional and contingent," said the court, and "[b]y its terms, UCC § 9-332 does not address the transfer of conditional or contingent interests in funds, only the transfer of actual money or funds." *Id.* UCC 9-332 nowhere refers to the transfer of an "interest in" funds. Rather, the court pointed out, the Official Comments refer to the payment of money or the transfer of funds by methods (i.e., check, cashier check, or wire transfer) that suggest a complete transfer of all interest in and control over the funds. "The plain language of the statute does not encompass the transfer of a partial, conditional, equitable interest in funds." *Id.* Thus, the court held that depositing funds in an escrow account was not a transfer under UCC 9-332.

{¶ 43} *Zimmerling* also held that when the funds were wired to the escrow account no transfer was made to the escrow agent. The court distinguished between equitable interest and legal title and said that even if an equitable interest in the funds was transferred, "legal title to the funds would not, under any circumstances, have been transferred to the escrow agent. In the case of a transfer of funds to an escrow account, the escrow agent holds the funds in trust as a fiduciary." *Id.* at 141. "The conditions of the escrow were never fulfilled, because there was no court order releasing the funds to [the judgment creditor],

and there was no transfer to [the judgment creditor] of an equitable or legal interest that would satisfy the phrase 'transferee of funds' within the meaning of UCC § 9-332." *Id.* at 142.

{¶ 44} In *PNC Equip. Fin., LLC v. Lopez*, Case No. DG 18-03292, 2021 Bankr. LEXIS 1939 (Bankr.W.D.Mich.2021), the court held that a judgment creditor is not a "transferee of funds" under UCC 9-332(b) upon service of a garnishment writ regarding funds in a bank account. Applying Michigan law, the court distinguished between the "attachment" of a judicial lien—when the judgment creditor obtains the lien—and the lien's "enforcement"—when the judgment creditor obtains rights to the garnished funds. "[A] lien creditor who garnishes a deposit account," said the court, "does not immediately obtain any 'funds' at the moment it serves the garnishment writ, only an execution lien in the deposit account, pending the outcome of the post-judgment proceedings." *Lopez* at *4. Under Michigan law, there is then a waiting period following service of a writ that allows a court to resolve any disputed claims to the garnished funds, "such as claims of the holder of a security interest or the execution lien of a judgment creditor." *Id.* at *6. To say that a judgment creditor is a "transferee" upon service of a garnishment writ, said the court, "puts the cart before the horse by swapping the concepts of attachment and enforcement." *Id.* at *7. Also, the court noted that if "a lien creditor becomes a 'transferee of funds' upon service of the garnishment writ, there would be no point in providing a post-garnishment process for resolving disputed claims." *Id.* Furthermore, it "would mean that a trustee in bankruptcy (included in the Uniform Commercial Code definition of 'lien creditor') would take a debtor's property free of perfected security interests, marking a sea change in our law." *Id.*

{¶ 45} Lastly, we consider *Outsource, LLC v. Horizon Communications Technologies, Inc.*, 2023 Cal.App.Unpub. LEXIS 1697 (Mar. 23, 2023), a recent

unpublished decision from California that appears to hold contrary to *Stierwalt* and to limit *Orix*'s broad interpretation of "transferee" under UCC 9-332(b). In *Outsource*, the defendant borrowed money and gave the lender a security interest in its deposit accounts. Subsequently, the defendant failed to pay the plaintiff for contracted services, and the plaintiff sued for breach of contract. California law contained a statutory procedure by which a plaintiff could obtain a prejudgment lien in the amount of the anticipated judgment in the pending lawsuit. The trial court issued the plaintiff a prejudgment lien—a right-to-attach order and writ of attachment ordering that, during the pendency of the litigation, the plaintiff had the right to attach the defendant's property, including the funds in its deposit accounts. After receiving the notice of attachment, the defendant's bank remitted account funds to a levying officer (the local sheriff's department). The lender filed a third-party claim against the levying officer asserting a senior security interest in the deposit account, and the plaintiff filed a petition with the court to determine validity of that claim. The trial court concluded that the third-party claim was valid, and that the lender had a security interest in the deposit account that had attached and was senior to the prejudgment lien. The plaintiff appealed.

{¶ 46} After concluding that the lender's security interest in the deposit account had attached, the appellate court rejected the plaintiff's argument that UCC 9-332(b) entitled it to possession of the funds in the deposit account free of the lender's security interest. The court concluded that the plaintiff was not a "transferee":

> [T]he term "transferee" has been interpreted broadly (*Orix Financial Services, Inc. v. Kovacs* (2008) 167 Cal.App.4th 242, 250, 83 Cal. Rptr. 3d 900). But even a broad definition of "transferee" does not reach a party—like [the plaintiff]—to whom funds were never actually transferred. [The plaintiff] obtained a writ of attachment and obtained a pre-judgment lien as to the funds in [the defendant]'s deposit account [under California law] * * *, but [the lender]'s third party claim halted the *transfer* of those funds into [the plaintiff]'s proverbial hands * * *.

(Emphasis sic.) *Outsource* at *7-8. The appellate court went on to conclude that the lender failed to present evidence that its security interest in the deposit account was, in fact, senior to the plaintiff's prejudgment lien.

{¶ 47} It does not appear that the question whether the levying officer—the temporary holder of the funds—was a "transferee" was raised. For our purposes, *Outsource* is instructive because the appellate court held that a prejudgment creditor did not become a "transferee" under UCC 9-332(b) upon the attachment to a bank account of a prejudgment lien and the deposit of funds with a temporary holder. This holding seems contrary to the holding in *Stierwalt*, which held that when the temporary holder of funds in that case (the U.S. Marshal) levied on the defendant's bank account, there was a transfer under UCC 9-332(b) (to the U.S. Marshal, presumably).

{¶ 48} In the case before us, JPMorgan paid the garnished funds to the Butler County Clerk of Courts to hold until any objection to garnishment was resolved. This is akin to the situations in *Zimmerling*, *Lopez*, and *Outsource*, cases in which funds were deposited with a temporary holder while it was determined who was ultimately entitled to them. We find these cases more persuasive than *Orix* and *Stierwalt*, especially in light of *Outsource*.

{¶ 49} Here, the order and notice of garnishment "attached" the funds that O'Gara had on deposit with JPMorgan. JPMorgan then paid the funds to the clerk to hold until the trial court, if necessary, resolved any objection to the garnishment. O'Gara and Monroe did object, interrupting the transfer of the funds to Wulco. At that point, only attachment had occurred; there had been no execution. Before execution could occur, the trial court needed to resolve the objections. Only when the court rejected the objections could Wulco's judgment lien be enforced and the funds be released to Wulco.

{¶ 50} Wulco was not a "transferee of funds" under R.C. 1309.332(B). Wulco did not

immediately obtain the funds upon service of the garnishment order and notice regarding O'Gara's bank account. *See Lopez.* Nor were any funds ever actually transferred to Wulco, as O'Gara's and Monroe's objection to garnishment halted the transfer of the funds. *See Outsource.* That transfer could not happen unless and until Wulco prevailed in the garnishment hearing.

{¶ 51} The Butler County Clerk of Courts was not a "transferee of funds" either. A R.C. 1309.332(B) transfer was not made when JPMorgan paid the funds to the clerk. *See Zimmerling.* The clerk was a mere temporary holder of the funds pending a court order about remittance. There was no remittance order here—no court order releasing the funds to Wulco, and no transfer to Wulco of an equitable or legal interest that would satisfy the phrase "transferee of funds" within the meaning of R.C. 1309.332(B).

{¶ 52} Fundamentally, when JPMorgan paid the funds from O'Gara's bank account to the clerk, it was not the type of transfer contemplated by R.C. 1309.332. *See Zimmerling.* This was not a transaction subject to the UCC. The clerk was merely a contingent, conditional, and temporary holder of the funds. And to pay the funds to the clerk was simply to deliver them to a neutral party to be held until any objections to garnishment could be resolved. We agree with *Zimmerling* that R.C. 1309.332 does not address the transfer of conditional or contingent interests in funds but only the transfer of actual money or funds. *See* Official Comment 2, UCC 9-332 (referring to payment of money or transfer of funds by methods that suggest a complete transfer of all interest in and control over the funds).

{¶ 53} Nothing in the conditional and contingent arrangement with the Clerk of Courts implicates the policy behind UCC 9-332, expressed in the Official Comments:

> Policy. Broad protection for transferees helps to ensure that
> security interests in deposit accounts do not impair the free flow
> of funds. It also minimizes the likelihood that a secured party
> will enjoy a claim to whatever the transferee purchases with the

> funds. Rules concerning recovery of payments traditionally have placed a high value on finality. The opportunity to upset a completed transaction, or even to place a completed transaction in jeopardy by bringing suit against the transferee of funds, should be severely limited. * * *

Official Comment 3, UCC 9-332. Paying the funds to the clerk did not impinge upon commerce. The clerk would not be using the funds to make purchases. Nor was finality a concern. Indeed, the transaction between JPMorgan and the clerk plainly was not—and was not intended to be—final. The clerk was only a temporary holder of the funds, holding them until the trial court could determine whether Wulco was entitled to them.

### III. Conclusion

{¶ 54} After the garnishment hearing, the trial court had to determine what portion of the funds JPMorgan had deposited with the clerk could be used to satisfy the debt. *See* R.C. 2716.13(C)(5). To do that, the court had to determine whether Monroe defeated the garnishment order by establishing a defense to garnishment. R.C. 2716.13(C)(1)(a); *Liverpool*, 2012-Ohio-2821 at ¶ 39. The court erred in its determination that Monroe did not establish a defense. Monroe established that it had a prior perfected security interest in O'Gara's bank accounts and funds with JPMorgan. That security interest was not stripped under R.C. 1309.332(B) when JPMorgan paid the funds on deposit to the Butler County Clerk of Courts. Neither Wulco nor the clerk was a "transferee of funds" under the statute.

{¶ 55} In addition, Monroe's security interest is superior to Wulco's judgment lien, as a security interest in specific property is "superior" to a judgment lien over that property unless the judgment lien attaches before the security interest is perfected, *see* R.C. 1309.317(A)(2)(a). But the garnishment statutes do not permit a determination as to whether the funds should be given to the secured party, here, Monroe. The most that can be determined is that the funds from O'Gara's bank account cannot be used to satisfy its

judgment debt to Wulco. Accordingly, the funds should be returned to JPMorgan for redeposit into O'Gara's bank account.

{¶ 56} The trial court's judgment is reversed, and judgment is entered for Monroe and O'Gara on their objection to garnishment.

M. POWELL, and BYRNE, JJ., concur.